IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YITCHOK ("Isaac") SHTEIERMAN, individually, and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>    -against-<br><br>ESA MANAGEMENT, LLC; ESH HOSPITALITY STRATEGIES LLC, ESH STRATEGIES FRANCHISE LLC; ESH STRATEGIES BRANDING LLC; DOE COMPANIES 1-10,<br><br>                    Defendants. | Case No: 7:23-4981<br><br><u>SUMMONS</u> |

**TO THE ABOVE-NAMED DEFENDANT:**

**YOU ARE HEREBY SUMMONED** and required to serve upon plaintiff's attorney an answer to the complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York.

In the case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

Plaintiff designates King County as the place of trial due to Plaintiff residing there and due to the fact that this was where the incident that forms the basis of this lawsuit took place.

Dated: New York, New York.
      June 15, 2023

*s/Scott Levenson, Esq*

Scott Levenson, Esq.
LEVENSON LAW GROUP
625 West 51st Street
New York, New York 10019
Tel. (212) 957-9200
Fax (201) 638-4822
Email: levensonlawgroup@gmail.com

***Counsel for Plaintiff and the Proposed Class***

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YITCHOK ("Isaac") SHTEIERMAN, individually, and on behalf of all others similarly situated, | Case No: 7:23-4981 |
| Plaintiff, | COMPLAINT |
| -against- | JURY TRIAL DEMANDED |
| ESA MANAGEMENT, LLC; ESH HOSPITALITY STRATEGIES LLC, ESH STRATEGIES FRANCHISE LLC; ESH STRATEGIES BRANDING LLC; ESA WASHINGTON, INC; DOE COMPANIES 1-10, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

**COMES NOW** the Plaintiff, Yitchok ("Isaac") Shteierman, (hereinafter "Plaintiff" or "Mr. Shteierman") by and through his attorney, Scott C. Levenson, Esq., of Levenson Law Group, and brings this action against Defendants ESA MANAGEMENT, LLC, ESH HOSPITALITY STRAGETIES LLC, ESH STRATEGIES FRANCHISES LLC, ESH STRATEGIES BRANDING LLC, ESA WASHINGTON, INC, and Doe Companies 1-10; (collectively, "Defendants"). Upon personal knowledge of the facts pertaining to himself and on upon information and belief as to all other matters, Plaintiff respectfully shows and alleges as follows:

## NATURE OF THE CASE

1. Plaintiff brings this class action on behalf of himself and all other similarly situated individuals who pre-paid for a reservation at an Extended Stay America hotel, were denied

accommodation in the prepaid hotel room by Defendant, and whose prepayment was not refunded.

2. Plaintiff also brings this class action on behalf of himself and all other similarly situated individuals who left their vehicle parked in the parking lot of an Extended Stay America, Inc. hotel, which was then vandalized, broken into, and/or had items of value stolen from their vehicle; or who were otherwise the victims or witnesses of crime by third parties or staff of Extended Stay America, while on the premises of an Extended Stay America hotel, due to the Defendants' negligence and failure to provide adequate security measures to prevent crime on its premises.

3. Extended Stay America is understaffed in the area of security, and vandalism, car break-ins and theft occur regularly, without any oversight from Extended Stay America hotel.

4. Extended Stay America is a hotbed of illicit, illegal and egregious criminal activity for which this Complaint seeks redress.

5. Extended Stay America routinely evicts tenants and keeps their prepaid lodging fees

## JURISDICTION AND VENUE

6. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because: (a) this action is brought as a proposed class action under Fed. R. Civ. P. 23; (b) the proposed Class includes more than 100 members; (c) Plaintiff and Class Members are citizens of states that are diverse from Defendants' domicile; and (d) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

7. Venue is also proper in this judicial District under 28 U.S.C. § 1391(b)(2) in that ESA conducts business, and a substantial part of the events giving rise to the Plaintiff's and Class Members' claims occurred in this judicial District.

8. This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from one Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

## THE PARTIES

### I. Plaintiff

9. Plaintiff Yitchok ("Isaac") Shteierman, hereinafter "Mr. Shteierman" is a citizen and resident of Brooklyn, New York. Plaintiff was a guest at the Extended Stay America hotel located in Factoria, Washington, with a prepaid reservation from February 12, 2023 until March 14, 2023. When his car was broken into, vandalized and his personal items were stolen from the vehicle while it was parked in the hotel, Extended Stay Management lied to him, towed his car and unilaterally canceled his reservation.

10. Although the Extended Stay America hotel denied Plaintiff accommodation at the hotel, pursuant to the terms of the agreement, the Extended Stay hotel retained Plaintiff's prepaid lodging fee of $ and failed and refused to refund the prepaid reservation.

11. Plaintiff, as a resident of New York, has standing under New York Law, and may also pursue claims in other states, and nationwide, that any class member would have standing to pursue. *Langan v. Johnson & Johnson Consumer Companies,* 897 F.3d 88 (2018) and Defendants may not limit Plaintiff's ability to represent the interests of everyone who was harmed by Defendants' bad conduct. *Id.*

## II. **Defendants**

12. Defendant ESA Management, LLC ("ESA Management") is a Delaware corporation, organized and existing under the laws of Delaware, with its headquarters in Charlotte, Mecklenburg County, North Carolina.

13. ESA Management is a wholly owned subsidiary of ESA Hospitality, Inc.

14. ESA Management is an extended stay hotel management company in the United States with more than 7,000 associates providing services at more than 555 Extended Stay America branded hotel sin 40 states.

15. ESH Hospitality, Inc. ("ESH Hospitality") is a Delaware company with its principal place of business in Charlotte, Mecklenburg County, North Carolina. ESH Hospitality is the largest lodging REIT in North America by unit and room count.

16. Prior to June of 2021, ESH Hospitality was a subsidiary of Extended Stay America, Inc.

17. Extended Stay America, Inc., was acquired for $20.50 per paid share in cash in a transaction valued at approximately $6 billion through funds managed by Blackstone Real Estate Partners and Starwood Capital Group.

18. The acquisition was completed through a merger of ESH Hospitality and Extended Stay America, Inc. on June 16, 2021.

19. Upon completing the foregoing transaction, Extended Stay America, Inc. was extinguished, and its stock ceased trading publicly.

20. ESH Hospitality became the successor to Extended Stay America, Inc., upon completion of the transaction.

21. Extended Stay America, Inc., was, and ESH Hospitality is the largest integrated owner operated chain of company-branded hotels in North America. Its hotels serve the mid-priced extended stay segment of the population and account for approximately 42% of that segment's share by number of rooms in the United States.

22. As of December 31, 2019, Extended Stay America, Inc., which later merged with ESH Hospitality, owned and operated approximately 557 hotel properties in 40 U.S. states, consisting of approximately 61,900 rooms, and franchised or managed 73 additional hotel properties for third parties, consisting of approximately 7,500 rooms.[1]

23. All 630 system-wide hotels operate under the Extended Stay America brand.

24. In August of 2022, the brand added an additional 100 properties, expanding its portfolio to 762 hotels with nearly 85,000 rooms in 45 states.[2]

25. For the year ending December 31, 2019, Extended Stay America, Inc., which merged with ESH Hospitality, had total revenues of $1.218.2 billion, with a net income of $165.1 million and an Adjusted EBITDA of $535 million.

26. During the year ending December 31, 2019, 52.8% of Extended Stay America, Inc.'s franchise and management fees and related revenues were derived from franchising activities, and 47.2% were derived from management activities.

27. ESH Hospitality's franchisees typically pay an initial application fee, along with monthly royalty and system service fees for the licensing of their brand the use of their shared system-wide platforms, such as marketing, technology infrastructure, central reservations, national sales and revenue management systems.

28. The standard term for ESH Hospitality's franchise agreements is generally 20 years.

---

[1] https://en.wikipedia.org/wiki/Extended_Stay_America
[2] https://www.hotelmanagement.net/own/extended-stay-america-adds-more-100-properties

29. ESH Hospitality competes with other lodging brands and products for potential franchisees.

30. Franchisees choose franchise systems based on a variety of reasons, including potential returns on investment, brand name recognition and reputation, brand standard requirements, franchisor's ability and willingness to invest capital, fees and other contract terms, availability of suitable hotels in certain geographic areas, sales support, marketing support, reservation systems, information technology systems, operational support, purchasing programs and other support systems.

31. Defendant ESA Hospitality Strategies, LLC ("ESH Strategies") is a Delaware corporation with its principal place of business in Charlotte, Mecklenburg County, North Carolina.

32. ESH Strategies is a wholly owned subsidiary of ESH Hospitality, Inc.

33. ESH Strategies owns the Extended Stay America brand, and licenses the brand and intellectual property to its subsidiaries, ESH Strategies Branding, LLC and ESH Strategies Franchise, LLC.

34. ESH Strategies Franchise, LLC is a Delaware company with its principal place of business in Charlotte, Mecklenburg County, North Carolina.

35. ESH Strategies Franchise, LLC is a wholly owned subsidiary of ESH Strategies.

36. ESH Strategies Franchise, LLC licenses the Extended Stay America brand name from ESH Hospitality Strategies LLC  and in turn re-licenses it to Operating Lessees and third-party franchises.

37. Defendant ESH Strategies Branding LLC is a Delaware corporation with its principal place of business in Spartanburg, South Carolina.

**38.** ESH Strategies Branding LLC licenses the Extended Stay America intellectual property and in turn re-licenses it to the Operating Lessees and third party franchises.

39. [Defendant ESA Associates Inc. is a corporation operating and existing under the laws of Washington State, with a principal place of business in Friday Harbor, Washington. ESA Associates is a wholly owned subsidiary of Extended Stay America.

40. Defendant DOE Companies 1-10 are necessary parties because the Agreement (Ex 1) states that it is between the consumer and "ESH Strategies Branding LLC and its affiliates, subsidiaries and related companies." The "affiliates, subsidiaries and related companies" are unnamed and therefore yet to be identified.

41. Defendants ESA Management, LLC, ESA Hospitality Strategies LLC, ESH Strategies Franchise, LLC, ESH Strategies Branding, LLC; and ESA Associates, Inc., and Doe Companies 1-10 are referred to collectively as "Defendants" or "ESA".

## FACTUAL BACKGROUND of EXTENDED STAY AMERICA

**I. The Extended Stay Hotel Industry**

42. Defendant ESA operates in the extended-stay segment of the lodging industry. ESA's sources of competition include other extended stay hotel brands, and extended stay guests and alternative lodging, including serviced apartments and private homes and rooms, and apartments rented on the internet, also referred to as "peer-to-peer inventory sources according to historical filings ESA has made with the U.S. Securities and Exchange Commission.

43. During the year ending December 31, 2019, ESA derived the greatest portion of its income from guests who stayed thirty nights or more - 41.6 %.

44. According to ESA's historical filings with the U.S. Securities and Exchange Commission, "Extended Stay America-branded hotels are designed to provide an affordable and

attractive alternative to traditional lodging or apartment accommodations and are targeted toward self-sufficient, value conscious guests who need lodging for more than a week. Guests include business travelers, leisure travelers, professionals on temporary work or training assignments, persons relocating, the temporarily displaced, those purchasing a home and anyone else in need of temporary housing."

45. ESA's CEO, Bruce Haase, explained at a virtual industry conference in September of 2020, ESA's "business travelers aren't what the industry thinks of as business travelers." "They are folks that need to be physically present to do their job. They can't get on a Zoom meeting." Haase added, "Or people lost a house. They've been in some sort of life transition that requires them to have temporary housing."

46. It is an "open secret" that many ESA guests live permanently in ESA hotel rooms.

> Early in the COVID pandemic, as thousands of midrange and upscale hotels closed their doors, Extended Stay America, a Charlotte-based chain with 652 locations in 44 states, kept all of its properties open, proving the strength of its model -- and making clear what had been an open secret: People were living permanently in some of its rooms. Founded in 1995, the publicly held company has experienced industry-defying prosperity during the pandemic: $96 million in profits on revenues of $1 billion in 2020. In March [of 2021], the Blackstone Group, the private-equity giant, partnered with Starwood Capital Group and agreed to guy the chain for $6 billion. *When No Landlord Will Rent to You, Where Do You Go?* New York Times (May 20, 2021)

47. Extended-stay hotels are the last housing option for low-income Americans to whom landlords will not rent, often due to prior evictions and the inability to pay the amount necessary up-front to lease housing, e.g. a security deposit and the first and last month's rent.

48. ESA purports to offer lower cost accommodations by providing reduced services, including housekeeping and linen services less frequently than a typical hotel.

**II. ESA's Criminal Activity**

49. However, ESA does not employ proper and reasonable security measures in order to protect its guests and their invitees from third party criminal activity. Defendants are currently defending against a lawsuit filed in the United States District Court for the Western District of Washington, pursuant to the Trafficking Victims Protection Re-authorization Act, 18 U.S.C. § 1595 for knowingly, openly and notoriously, for more than ten years, allowing sex traffickers to continuously and repeatedly victimize minors and others, under the ESA roof and banner. *See A.B. v. ESA et al,* Case No: 3:22-cv-5939

50. In that case Plaintiff alleges that Defendants, who are solely motivated by profits and the value of the "good will" of their brand, refuse to institute meaningful steps to stop trafficking upon its premises, and instead continue to operate their hotels in a manner which enables and harbors the repeated and continuous trafficking, exploitation and victimization of individuals for their own benefit.

51. In December of 2018, a 16-hour standoff with police occurred on the premises of an ESA hotel in Roanoke, VA while they investigated reports of a stolen vehicle.[3] A man had barricaded himself in and fired shots at the officers.

52. In December of 2019, 69 car windows were smashed at ESA hotels in Altamonte and Maitland, FL, near Orlando.[4] Maitland Police stated: "In most of the burglaries, side windows were smashed so quietly that no one heard it. Car alarms were never triggered."

---

[3] https://www.wdbj7.com/content/news/Police-presence-at-Extended-Stay-America-after-man-barricaded-himself-inside-503637901.html
[4] https://www.clickorlando.com/news/local/2019/12/30/69-car-windows-smashed-at-hotels-in-altamonte-maitland/ https://www.thedrive.com/news/31675/brazen-burglars-smash-car-windows-of-almost-70-vacationers-near-orlando

53. In May of 2021, a person was killed and another hospitalized following a shooting in a stairwell of an ESA Hotel in Henrico County, VA.[5]

54. In August of 2022, at least 27 vehicles were broken into at an ESA hotel in Memphis, TN.[6]  When asked to comment, management of the ESA hotel "refused to comment."

55. In October of 2022, the Dallas City Council heard a rezoning request to turn an ESA hotel into an apartment complex, in order to rid the area of the crime-infested hotel.[7]  The article entitled "Hotel Hell" highlights the fact that the particular ESA hotel in question has a "recent past marked by drug trafficking, sex crimes and murder" according to police.  Two of the hotel's former staffers are in federal prison.  Quotes from the article include:  "This property has a torrid history" and "Delay the rezoning approval and make the owners of Extended Stay America prove that they can fix their crime problem.

56. It is not a matter of can, but it is clearly a matter of "won't."  ESA is well aware of its crime and security problem.  Plaintiff found dozens and dozens of news articles online of the sort set forth herein, but may many more related to murders and shootings occurring in ESA hotels.

57. Reviews available online of ESA Hotels by way of tripadvisor.com and orbitz.com shed additional light on the experiences of guests and the fact that Defendants appear to employ no security at all.  Going back as far as 2012, a few examples are as follows:

> **Zero SECURITY**
>
> Review of **Extended Stay America - Columbus - NE I-270**
>
> Reviewed August 29, 2015
>
> After being a guest here for over 3 weeks, I find out the hard way that they have one security camera for the front desk, that they've done away with manned security and have absolutely no security cameras outside the hotel, so yes your safety and your vehicle are 100% at risk, my vehicle was broken into after they had several break in's and failed to

[5] https://www.wric.com/news/crime/two-people-in-critical-condition-following-shooting-in-henrico/
[6] https://wreg.com/news/local/two-hotels-become-car-burglary-site-within-4-days/
[7] https://lakehighlands.advocatemag.com/2022/10/31/hotel_hell/

even have the courtesy to inform anyone with so much as a letter the other poor guy had his second break in in less than one week at the same time as mine, they claim absolutely zero responsibility and not so much as a call to express any concern. So after loosing over $2000 worth of items from my truck which were not in view but put away and having to pay over $200 for my broken window. They pretend it did not happen and still have not informed guests of their lack of security and video surveillance. What a crock, I'll never stay here again and hope that any corporate accounts be severed. So if you stay here or have employees stay here make sure they tuck in for a great nights sleep in their cars because that is the only way o guarantee it wont be broken in to, Oh yeah forgot to mention the prostitutes that rent out rooms and others who sleep in the parking lot in cars who cant afford rooms, yup that's Class for ya!! In Easton.

**Date of stay:** July 2015 - Frank L

### car vandalized in the parking lot

Review of **Extended Stay America Select Suites - Atlanta - Chamblee**

Reviewed 21 August 2015
On the morning of 7/31/15 my car was vandalized in the parking lot along with about 10 other vehicles. Management offered a small allowance (about 1/7th of the cost I paid to repair my car) but to this day I still have not received anything.

**Date of stay:** July 2015  **Trip type:** Travelled on business

Heather L, Guest Relations Manager at Extended Stay America Select Suites - Atlanta - Chamblee, responded to this review Responded 24 August 2015

We are sorry to hear about your car being vandalized. We are currently working on ways to improve the security outside of our property. Thank you for letting us know about the situation so we can handle it appropriately. We apologize for the inconveniences and wish you the best.

### Car Stolen in Parking Lot

Review of **Extended Stay America Select Suites - Charleston - Ashley Phosphate Rd.**

Reviewed January 26, 2012
My car was parked just three spaces from the front door and it was stolen out of the parking lot. This was Saturday night on 1/21/2012. There are no video camera's on the outside of the building so they are not responsible for any activity, criminal or otherwise, that happens here,

but possibly able to help if they catch the activity on one of the camera's inside the bldg. It is ironic that the other two Value Places in Charleston SC have perm. security by armed officers. The young girl who works the front desk during the week is very rude. The weekend girl is more knowledgeable and accommodating. The rooms are clean, but the people staying right above us must have had an elephant staying with them. Noises and terrible smells in the hallways and out front where all the smoker's congregate. My car has yet to be recovered!!!!!! This was not a pleasant experience to say the least.Show less

**Date of stay:** January 2012
**Trip type:** Traveled with family

### THE HOTEL OF DEATH AND NIGHTMARES STAY AWAY FROM THIS HOTEL CUSTOMER SERVICE IS CRIMINAL

Review of **Extended Stay America Jacksonville - Salisbury Rd. - Southpoint**

Reviewed December 25, 2019 via mobile

Let me start by starting with this i was awoken at 4am by the staff member on dutie and asked if i could assist them there was somebody passed out in the stair case and she did not want to go alone so as a gentleman i said i would go when we got to the staircase i noticed it was not a man the person was Transgender i tried waking the person with my voice and no responce i checked to see if the person was breathing and they seemed not to be breathing there was a liquid coming from the nose of the person. the staff member told me i should throw sum water on them i refused to. I then checked for a pulse and the person had no pulse and was freezing cold they were deceased this made me very unsafe and freaked out i told her to call 911 immediately and went back to my room and regurgitated in the bathroom several times i was freaking out from what i just saw and i still felt the coldness from the body on my hand i was also told by staff not to mention any of this i guess this being the second death of a transgender person on one of there properties would been alerted to the news stations so i did not mention amything and there was no mention on the news or paper as if this never happened but i have photos of the incident photos that i was told to erase by management i just wanted to cover myself thats why i took the photos from my phone.

### How "management" handled a death at the hotel

Review of **Extended Stay America - Red Bank - Middletown**

Reviewed June 20, 2020
We unfortunately had a family member die at the hotel, where he was staying while waiting for his new home to be ready. Robert, the hotel

manager, confiscated the man's possessions and refused to provide an inventory. He also said he would not be responsible for the items, and that he did not see the man's wallet in his room. The hotel kept the possessions, still with no inventory provided to us, for nine days while we tried through a company customer-service representative in North Carolina to get his things back. Extended Stay released the items only when we demanded to know what law permitted the chain to keep everything. Since there was not a law sanctioning this overreach, the hotel chain's lawyers got worried we would sue and ordered the release of the items. We were in touch with the local police during this entire outrage, which included more insulting behavior and incompetence than I am listing here, and they could not believe what the hotel was doing to our grieving family. When we went to get the man's possessions, finally, and still didn't know if his wallet was among them or had been stolen, this creep Nadine behind the desk said to me: "Why don't you ask your dead [relative] where his wallet is?" Yes, she actually said that. I have it recorded on video on my phone. I emailed a copy of the video to the customer-service rep. We later found the wallet among the man's possessions, which a proper inventory would have revealed. I don't know what happened to Nadine, but Robert is still the manager. My advice: Stay at this hotel at your own risk.
**Date of stay:** April 2020


Am S.
Long Beach, MS

3/2/2020

Well where to begin? Over 20 vehicles were broken into last night in the parking lot. No security cameras. Terrible service and really out dated. The shower temperature is either extremely cold or scorching hot.

58. There are literally hundreds of similar genuine reviews available online, and Plaintiff includes a small sample in order to both conserve judicial resources, and demonstrate to the Court the necessity of this Class.

59. Defendants are thus wholly unconcerned with implementing property security at their hotels and with the criminal acts of third parties which take place on their premises.

**III. ESA Unlawfully Evicts Guests and Keeps their Prepaid Lodging Fees**

60. In addition to the crime problem, ESA has a problem with unlawful evictions as well as failing to refund guests who are evicted for their prepaid hotel reservations.

61. According to ESA's guidelines, a prepaid reservation, or "advanced purchase" reservation, is non-cancelable by the guest 24 hours after the booking. ESA's Terms and Conditions provides that, "[c]ancelling more than 24 hours after the original time of the booking, or failing to show, will forfeit [the guest's] nonrefundable advance prepayment equal to the total cost of the reservation (including tax)."

62. However, ESA may cancel a prepaid reservation. If a guest who has prepaid for a reservation attempts to check in to their room after midnight of the first day of their prepaid reservation, the reservation system prohibits the guest from doing so and prompts the hotel employee to tell the guest that their reservation "cannot be accommodated." ESA then retains the prepaid lodging fee.

63. A guest already staying at an ESA hotel learns of the cancellation of their prepaid reservation in one of two ways: First, the guest's key card is deactivated so that they are locked out of their room if they leave their room, or if, as happened in Plaintiff's case, they were not present at the hotel when ESA decided to cancel their reservation.

64. The ESA reservation system does not allow staff to check the guest into the room once the reservation has been canceled.

65. The guest is then locked out of the room without access to the guest's personal belongings. Defendants then refuse to refund prepaid reservations.

66. ESA's hotel guests are sometime individuals without ready means to timely obtain alternative lodging when they are denied accommodation, and are also often not individuals who can afford to have their prepaid lodging fees deemed nonrefundable.

## FACTUAL ALLEGATIONS

67. Plaintiff Yitchok Shteierman, (hereinafter "Mr. Shteierman") is a businessman and frequent business traveler.

68. Plaintiff booked and prepaid for a 30-day stay with Defendant ESA in Factoria Washington State, outside of Bellevue. He booked a room at Defendant ESA in Factoria, from February 12th, 2023 until March 14th, 2023, prepaying for the entire stay in advance, in the amount of $2,280, with his credit card.

69. Defendant ESA accepted Plaintiff's booking, reserved the stay for Plaintiff and took his payment.

70. Through no fault of his own, but entirely due to the negligence of Defendant, Plaintiff's vehicle was damaged and his personal property was stolen.

71. When he checked into Defendants' Factoria location on February 12th Plaintiff had parked his car in the parking lot of the hotel and prepared to stay for the month. Upon checking in, Plaintiff inquired of the check-in clerk whether it would be safe for him to leave his vehicle parked in the hotel's parking lot. The representative told him it would be fine, that there were never any break-ins, and that he had nothing to worry about.

72. Within a short time after arriving, Plaintiff needed to leave take an urgent business trip to New York.

73. On the evening of February 12th, 2023, Plaintiff left the hotel, leaving his vehicle in the parking lot of the ESA. He obtained transportation to the airport and left in his flight that evening.

74. On the evening of Thursday, February 16th, 2023, Plaintiff telephoned an individual whom he knew in the Factoria/Bellevue area to ask her to check on his car since he was still in New York at the time and uncertain when he would return. His friend said that she would do this the next day.

75. In or around the early morning hours of Friday, February 17th, 2023, Plaintiff's vehicle was brutally vandalized. A window had been smashed in order to gain entry, the driver's side door was completely ripped apart, items were strewn all over the car and Plaintiff's valuable items were taken, including two Ipads, a laptop computer and one cellular telephone. The stolen items have a value of $10,000.

76. When Plaintiff's friend saw this she called him and informed him that his car had been damaged and broken into.

77. When Plaintiff contacted a representative of the Extended Stay America in Factoria to discuss this, he was told that he would need to contact the local police department.

78. Before doing so, and while lodging a report of the break-in to his vehicle, Plaintiff asked the ESA representative if this was something out of the ordinary or if this happened frequently at their ESA premises. The representative told him that he did not know of any other incidents where such a thing had happened.

79. Plaintiff then contacted the police department in Bellevue, Washington to inform them of the break-in of his car while at Defendants' premises and file a report.

80. Plaintiff asked the police officer the same question regarding frequency of this type of incident.

81. The officer informed Plaintiff that he was aware of four (4) other incidents that had taken place involving vehicles being damaged in that same parking lot, within the past week.

82. After discovering this, Plaintiff contacted a representative, but no one would talk to him. ESA completely ignored Plaintiff and did not care about what had happened to him.

83. Even though Plaintiff's booking was confirmed from February 12th through March 14th, 2023, after he reported his car break-in to ESA's representative and despite telling them that he was flying back as soon as possible to attend to his car, Extended Stay unilaterally canceled his booking.

84. On Saturday, February 17th, 2023, Plaintiff took a flight from New York back to Bellevue. Once he landed, Mr. Shteierman immediately went to the premises of the Extended Stay America in Factoria to retrieve his car. When he did so, he discovered that Defendant ESA had done nothing to protect his car. His car was still there with personal items strewn all about, both inside and outside of the car.

85. Plaintiff then learned that ESA had unilaterally canceled his prepaid booking. ESA had thrown Plaintiff out, keeping the personal items he had left in his room. Defendants then charged him the regular, higher daily rate for the five days, keeping the tax on the entire $2,280 amount that would normally have been refunded after he checked out on March 14, 2023.

**86.** ESA did all of this without Plaintiff's consent and in spite of the following facts: (a) that the representative knew that Plaintiff was flying back from New York to Washington to attend to his car, (b) that Plaintiff still needed a place to stay while in Washington, and (c) despite the fact that Plaintiff had fully prepaid for his stay up through and including March 14, 2023.

## CLASS ACTION ALLEGATOINS

87. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this lawsuit on behalf of himself and the following proposed Nationwide Class, defined as follows:

All individuals who left their vehicle parked in the parking lot of an Extended Stay America, Inc. hotel, which was then vandalized, broken into, and/or had personal property stolen from their vehicle or were otherwise the victims of crime while on the premises of an Extended Stay America hotel, in violation of their rights as guests of ESA and due to the Defendants' negligence and failure to provide adequate security measures to prevent crime on its premises.

All individuals whose reservations were canceled through no fault of their on and who were denied accommodation due to Extended Stay America's unfairly prejudicial cancellation policies which violate tenants' Due Process rights under the United States Constitution.

88. Both proposed Nationwide Classes will be collective referred to as the Class, except where it may be necessary to differentiate them.

89. Plaintiff reserves the right to amend the above definitions or to propose alternative or additional sub-classes in subsequent pleadings and motions for class certification.

90. Excluded from the Class are: (a) ESA, their officers, directors, employees, affiliates and their affiliate's officers, directors and employees, their distributors and distributor's officers, directors and employees; (b) Plaintiff's counsel; (c) judicial officers and their immediate family members and associated court staff assigned to this case; and (d) persons or entitles who or which timely and properly excluded themselves form the Class.

91. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging these same claims.

92. **Numerosity**: Federal Rule of Civil Procedure 23(a)(1). Plaintiff does not know the exact number of Class Members because such information is in the exclusive control of the Defendants. However, Plaintiff believes that due to the nature of the trade and commerce involved, Class Members are sufficiently numerous, most likely hundreds if not thousands of consumers; they are geographically dispersed throughout the states in which ESA operates, and

the joinder of all Class Members is impracticable. The information as to the identity of the Class Members can be readily determined from records maintained by the Defendants, such as hotel registration and incident records, copies of police reports maintained on file with Defendants and through public notification.

93. **Commonality Questions of Fact and Law**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). This action involves common questions of law and fact that predominate over any questions affecting individual Class Members, including:

a. Whether Defendants negligently fail to provide sufficient and reasonable security measures, such as bright lighting, security cameras, video cameras, security guards after multiple car break-ins in order to protect their parking lots from theft, break-ins and vandalism.

b. Whether Defendants employ security guards for their parking lots at all; and if so, whether they are properly trained and effective, whether security is adequate for the size of the hotel and parking lot and whether it is property deployed to deter criminal activity in the parking lots.

c. Whether there have been requests or demands for additional security for the Defendants' parking lots and how preventable these third party crimes are.

d. Whether there is a change in the nature of activity being conducted on the premises that Defendants are or should be aware of.

e. Whether Defendants warn guests of the possibility of car vandalism, theft and break-ins as foreseeable dangers while on their premises.

f. Whether Defendants should be required to upgrade existing security measures, such as hiring security guards after criminal activity recurs on their premises.

g. Whether Defendants respond appropriately when their negligence proximately causes third party damages to a guest's vehicle.

h. Whether Defendants know that the perpetrators of economic crimes like larceny, car breaking can become violent if the perpetrator is confronted either intentionally or inadvertently.

i. Whether Defendants routinely evict lawfully occupying guests from their hotels without warning.

j. Whether Defendants routinely evict lawfully occupying guests from their hotels when a third party damages the guest's vehicle lawfully parked on Defendant's premises.

k. Whether the ESA reservation system and/or policy and/or practice deems guests who have prepaid for a registration prevents ESA from refunding prepaid reservations that are not accommodated;

l. Whether Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of Class Members;

m. Whether similar or identical statutory and common law violations, business practices, and injuries are involved; and

n. Whether individual questions, if any, pale by comparison, in both quality and quantity to the numerous common questions that dominate this action.

94. **Typicality** Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims are typical of the claims of Class Members because, among other things, Plaintiff and Class Members were injured through the substantially uniform misconduct by the Defendants, as described herein. Plaintiff is therefore advancing the same claims and legal theories on his own behalf and on behalf of Class Members, and no defense is available to Defendant that is unique to Plaintiff.

95. **Adequacy of Representation** - Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members. Plaintiff will fairly, adequately and vigorously represent and protect the interests of the members of the Class. Plaintiff has retained local counsel who is competent and experienced in class action litigation. Thus, the Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

96. **Superiority** -- Federal Rule of Civil Procedure 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class

action. The damages, harm, or other financial detriment suffered individually by Plaintiff and Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendants, making it impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system should not be forced to shoulder such inefficiency. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

97. Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class, making appropriate both declaratory and injunctive relief with respect to Plaintiff and the class as a whole.

## CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT
**(On behalf of the Nationwide Class Against All Defendants)**

98. Plaintiff repeats, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

99. Plaintiff brings this action on behalf of the Nationwide Class against all Defendants.

100. Plaintiff and members of the Class entered into an agreement (hereinafter "Agreement") with Defendants to provide lodging in exchange for lodging fees.

101. Plaintiff and members of the Class fulfilled their obligations under the Agreement, a copy of which is attached hereto as **Exhibit A,** by paying lodging fees to the Defendants, and by doing no such act that would violate the terms of the Agreement.

102. Defendants breached the contract with Plaintiff and members of the Class by denying Plaintiff and members of the Class lodging accommodation at an Extended Stay America hotel.

103. Defendants have retained lodging fees paid by Plaintiff and members of the class without providing Plaintiff and members of the class the benefit of the bargain.

104. Plaintiff and members of the Class have suffered damages as a direct and proximate result of Defendants' breaches, including, but not limited to, being unreasonably deprived of lodging accommodation at an Extended Stay Hotel, through no fault of their own.

105. As a direct and proximate result of Defendants' breaches of Agreement, Plaintiff and members of the Class have been damaged and will be damaged in an amount to be proven at trial.

## COUNT II: UNJUST ENRICHMENT
### (On behalf of the Nationwide Class Against All Defendants)
### (Pleading in the alternative)

106. Plaintiff repeats, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

107. Plaintiff brings this action on behalf of the Nationwide Class against all Defendants.

108. Defendants have received a benefit at the expense of Plaintiff and members of the Class to which Defendants are not entitled.

109. Plaintiff and members of the class paid lodging fees for accommodations they never received.

110. Defendants have received and retained unjust benefits from the Plaintiff and Class Members in the form of lodging fees, even though Defendants have failed to provide the lodging accommodation for which the lodging fees were collected, making Defendants' retention unjust under the circumstances and inequity has resulted.

111. It is inequitable and unconscionable for Defendants to retain these benefits.

112. Defendants knowingly accepted the unjust benefits as a result of their conduct alleged herein.

113. As a result of Defendants' conduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and members of the class, in an amount to be proven at trial.

## COUNT III: FRAUD
### (On behalf of the Nationwide Class Against All Defendants)

114. Plaintiff repeats, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

115. Under New York Law, to establish fraud a Plaintiff must prove five elements by clear and convincing evidence: (1) a material misrepresentation or omission of fact; (2) made by defendant with knowledge of its falsity; (3) an intent to defraud; (4) reasonable reliance on the part of the Plaintiff; and (5) resulting damage to the Plaintiff. *See Crigger v. Fahenstock & Co., Inc.* 443 F.3d 230, 234 (2d Cir. 2006).

116. Defendants fraudulently induced Plaintiff and members of the Class, to stay at their hotels, by prepaying for stays, which Defendants never intended to honor.

117. Defendants then throw out Plaintiff and members of the Class, without cause, and wrongfully and unlawfully retain their prepayments for lodging, or some portion thereof.

118. Defendants' acts and omissions, as described herein, constitute common law fraud and they are liable for the damages their fraudulent conduct has cost the Plaintiff and members of the Class.

119. As a direct and proximate result of the foregoing, Plaintiff and the members of the Class have been damaged and will be damaged in an amount exceeding $10 million.

## COUNT IV - CONVERSION
### (On Behalf of the Nationwide Class Against All Defendants)

120. Plaintiff repeats, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

121. New York law defines conversion as "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F 3d. 400, 403-04 (2d Cir. 2006).

122. Plaintiff and members of the Class prove conversion by establishing four elements: (1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the property, to the alteration of its condition or to the exclusion of the plaintiff's rights. *Moses v. Martin,* 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004).

123. Plaintiff and members of the class who have had their belongings kept and stolen by Defendants after being illegally thrown out of the Defendant's hotels have had their specific personal belongings converted, after previously owning, possessing or controlling said belongings prior to their conversion; and Defendants exercised an unauthorized dominion over the specific property, to the exclusion of the rights of Plaintiff and members of the Class.

124. Plaintiff and members of the Class can clearly establish that Defendants acted without authorization in their taking personal belongings, exercising a right of ownership over the belongings and then converted and altering them or simply to the exclusion of Plaintiff Katz' rights.

125. As a direct and proximate result of the foregoing, Plaintiff and members of the Class have been damaged and will be damaged in an amount exceeding $10 million.

### COUNT V: NEGLIGENT SECURITY
**(Violation of Innkeeper's Duty Laws
On behalf of the Nationwide Class Against All Defendants)**

126. Plaintiff repeats, re-alleges and incorporates by referenced the preceding paragraphs as if fully set forth herein.

127. Defendants breached their duty of care to Plaintiff and all Class members by failing to properly hire and employ security guards in the parking lot of their premises to prevent the foreseeable criminal acts of third parties.

128. According to Innkeeper's duty laws, which are New York's version of premises liability laws, Property owners have a legal duty to maintain safe conditions in their premises. This includes providing proper security measures that reduce the possibility of criminal activity occurring on a property. However, some property owners fail to do so, resulting in property crime.

129. A landowner has a common-law duty to take minimal security precautions to protect tenants and members of the public from the foreseeable criminal acts of third parties." *Wayburn v. Madison Land Ltd. Partnership,* 282 AD2d 301, 303 (1st Dept 2001).

130. Multiple vehicle break-ins had occurred in the same week on the premises at Factoria, Washington, putting Defendants on notice of the problem.

131. Landowner liability is established if the landowner was negligent in its duty to protect its guests. *Scurry v. New York City Hous. Auth.,* 193 A.D.3d 1, 5 (2d Dept. 2021). This extends to tenants and their guests. *Braithwaite v. New York City Hous. Auth.,* 92 A.D.2d 821, 823 (2d Dept. 2012) Defendants knew or should have known about the multiple car break-ins on their property, but did nothing in response to this.

132. The scope of a Landowner's duty of reasonable care to maintain its premises in a safe condition for lawful guests arises from past criminal experiences and likelihood of the criminal conduct endangering a visitor's safety. *Maheshwari v. City of New York,* 810 N.E.2d 894, 897 (2004).

133. Foreseeability and notice are the two crucial elements in determining landowner negligence in safely maintaining its premises. Courts examine such factors as: (1) previous criminal conduct; (2) similarity to the occurrence at issues, and; (3) the proximity of previous crimes to the owner's premises. *Gentile v. Town & Vill. of Harrison,* 137 A.D.3d 971, 972 (2d Dept. 2016). Plaintiff and the members of the Class have established that multiple vehicle break-ins had occurred within one week of the breaking in to his vehicle on Defendants' premises.

134. A landowner will be held liable if the plaintiff presents sufficient evidence of previous similar criminal conduct in close proximity to the premises. A landowner who fails to take minimal precautions to protect lawful guests and residents of its premise will be liable for injuries sustained as a result of criminal conduct. The burden increases when the Plaintiff establishes significant similar criminal occurrences within a reasonable proximity of the premises.

135. Defendants had a duty to Plaintiff and all Class Members to take minimum security precautions to protect them; Defendants breached that duty; Defendants' breach of that duty proximately caused the damages to Plaintiff and all Class Members.

136. Defendants were negligent and breached their duty of reasonable care for the safety and protection of guests on their premises in the following ways:

(a) By failing to provide adequate security for the users, guests and invitees of its premises, including the Plaintiff and Class Members;

(b) By failing to have an adequate number (or any) security guards to protect the users, guests and invitees of its premises, including the Plaintiff and Class Members;

(c) By failing to have competent security guards (if any) to protect users, guests and invitees of its premises, including the Plaintiff and Class Members;

(d) By failing to property train security guards (if any), so that they could protect the users, guests and invitees of the premises, including Plaintiff and Class Members;

(e) By failing to have a sufficient number of security guards (if any) in visible areas to deter crime in the parking lot and thereby protect users, guests and invitees of its premises, including Plaintiff and Class Members;

(f) By failing to take additional security measures, after being put on notice that security measures were inadequate;

(g) By failing to reasonably and effectively utilize and monitor existing security devices in place, including closed circuit television cameras.

(h) By failing to warn, protect, guard and secure the safety of the vehicle of the Plaintiff and Class Members, when the Defendants knew or should have known of the existence of criminal activity upon its premises and the danger to those entering its premises.

(i) By failing to implement adequate security policies, security measures and security procedures necessary to protect the vehicle of the Plaintiff and Class Members;

(j) By failing to police, patrol, guard, deter, and otherwise provide adequate protection for patrons of its premises, when Defendants knew or should have known of the foreseeable criminal acts;

(k) By failing to secure the perimeter of the parking lot to prevent trespassing and criminal activity thereupon by those not doing business with Defendants; and

(l) By failing to remove trespassers from the parking lot of its premises when Defendants knew or should have known of their existence and activities.

137. Plaintiff and all Class Members were injured solely as a result of the negligence, carelessness and recklessness of the Defendants, without any negligence on the Plaintiff or Class Members contributing thereto.

138. As a direct and proximate result of the above described negligence of the Defendants, Plaintiff and all relevant Class Members were criminally violated and robbed upon the premises of the Defendant's hotels and sustained damages, mental pain and suffering, psychological injuries, aggravation of preexisting conditions and emotional distress.

139. As  direct and proximate result of the negligence of Defendants, Plaintiff and all Class Members have been damaged and will be damaged in an amount to be proven at trial, but reasonably believed to be in excess of $100 million.

## COUNT VI: UNFAIR AND DECEPTIVE TRADE PRACTICES
### (NY CPLR §20-700; NY Gen Business Law §349.)
### (On behalf of the New York Subclass Against All Defendants)

140. Plaintiff repeats, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

141. Under CPLR § 20-700, a deceptive trade practice includes "[a]ny falsely disparaging, or misleading oral or written statement . . . or other representation of any kind made in connection with the sale . . . or . . . the offering for sale . . . of consumer goods or services."

142. The acts and omissions of ESA, as described herein, violate § 20-700 and the prohibitions against this very conduct.

143. To succeed on a Section 349 claim, a plaintiff must allege that the defendant's conduct (i) was consumer-oriented; (ii) was materially deceptive; and (iii) resulted in an

injury to the plaintiff. *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP, et al. v. Matthew Bender & Co.* (2021 NY Slip Op 03485 Decided on June 3, 2021)

144. The acts and omissions of Defendant ESA, as described herein, violate both § 20-700 *et. seq.* and § 349 of New York General Business Law.

145. In the course of Defendants' business, Defendants intentionally or negligently concealed and suppressed material facts concerning the true nature of a prepaid hotel reservation, as well as the true facts regarding their hotel security.

146. Defendants accomplished this by collecting lodging fees for prepaid hotel reservations, denying Plaintiff and members of the class lodging accommodations at an Extended Stay America hotel during the term of the prepaid reservation, and failing to refund the prepaid lodging fees.

147. Defendants thus violated the Acts by, at a minimum: (a) collecting lodging fees for lodging accommodation; (b) representing that the guest prepaying for a reservation would be accommodated at an ESA hotel during the term of the prepaid reservation; (c) denying accommodations to guests who prepaid for a reservation at an Extended Stay America hotel during the term of the prepaid reservation; and (d) failing to refund prepaid reservations when Defendants denied Plaintiff and members of the class lodging accommodations at an Extended Stay Hotel during the term of the prepaid reservation.

148. Defendants engaged in substantial aggravating factors of deception, deceptive acts or practices that violated § 20-700 *et. seq.* and New York Business Law § 349.

149. Defendants intentionally and knowingly misrepresented material facts regarding the hotel room stays with intent to mislead Plaintiff and the Class.

150. Defendants' intentional omissions and misrepresentations are substantial aggravating factors of Plaintiff's and Class Members' injuries.

151. Defendants knew or should have know that their conduct violated New York CPLR § 20-700 *et seq.* and New York Business Law § 349.

152. Defendants' unfair and deceptive trade practices were likely to and did in fact deceive reasonable customers, including Plaintiff about the true nature of the prepaid lodging reservations.

153. Plaintiff and the Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Class members would not have opted to prepay for a reservation at an Extended Stay America hotel had Defendants disclosed the true nature of their practices.

154. As a direct and proximate result of the foregoing acts and omissions by Defendants Plaintiff and members of the Class have been damaged and will be damaged in an amount that exceeds $100 million, including, but not limited to treble damages, an order enjoining Defendants' deceptive and unfair conduct, court costs and reasonable attorney's fees, as well as any other just and proper relief available under § 20-700 and § 349.

## COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (On Behalf of the Nationwide Class Members against All Defendants)

155. Plaintiff repeats, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

156. Under New York law, a party who has been subjected to "conduct . . . so outrageous in character, and so extreme in damages, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" is entitled to prove a

claim for intentional infliction of emotional distress." *Murphy v. Am. Home Products Corp.,* 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236 (1983).

157. To recover damages for intentional infliction of emotional distress, a plaintiff must establish four distinct elements, including (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing severe emotional distress; (3) severe emotional distress; and (4) a causal connection between the conduct and a cognizable injury. *Howell v. New York Post Co., Inc.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353 (1993).

158. Defendants acts and omissions, as described herein were and are extreme and outrageous and either designed to, or in complete and utter disregard of the probability of causing severe emotional distress in Plaintiff and Class members. As established herein, Plaintiff and Class members have suffered severe emotional stress and distress and damages resulting from the acts and omissions of Defendants.

159. An award of punitive damages is intended to advance the important state interests of deterrence and retribution. *State Farm Mut. Auto Ins. Co. v. Campbell,* 538 U.S. 408, 416, 123 S. Ct. 1513, 1519 (2003). The factors to be considered when awarding punitive damages include: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Lee v. Edwards,* 101 F.3d 805, 809 (2d Cir. 1996).

160. Punitive damages, or exemplary damages, are damages assessed to punish the Defendants for outrageous conduct similar to that which formed the basis of the lawsuit.

161. Plaintiff and all Class Members are entitled to actual and punitive damages based on the outrageous, intentional, willful and wanton acts of the Defendants, as described in this Complaint.

## COUNT VIII: ATTORNEYS' FEES
### (Payment of Attorneys Fees By All Defendants)

162. Plaintiff repeats, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

163. The acts and omissions by all of the Defendants as set forth herein were willful and wanton and they harmed Plaintiff and all Class Members.

164. As a result of all Defendants' acts and omissions, as described herein, Plaintiff and the Class members were forced to initiate this proceeding.

165. Plaintiff and the Class members therefore have a right to attorneys' fees and costs for having to initiate and litigate this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the members of the Class, prays for the following;

1. An Order certifying this action as a Class Action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

2. An Order requiring Defendants to pay the costs involved in notifying Class Members about the judgment an administering the claims process;

3. An Order awarding Plaintiff and Class Members damages for the unlawful conduct of Defendants, as set forth herein;

4. Special damages according to proof;

5. Restitution and disgorgement according to proof;

6. Injunctive relief against Defendants to prevent future wrongful conduct;

7. Prejudgment interest at the maximum legal rate;

8. Cost of the proceedings herein;

9. Reasonable attorneys fees; and

10. All such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims in this Class Action Complaint so triable.

Dated: June 15, 2023
New York, New York

**LEVENSON LAW GROUP**

By:__/s/Scott Levenson__
Scott Levenson, Esq.
625 West 51st Street
New York, New York 10019
(347) 352-2470
LevensonLawGroup@gmail.com
***Counsel for Plaintiff and the Proposed Class***